**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Justin Joy,<br>Plaintiff,<br>v.<br>Flagstaff Unified School District,<br>Defendant. | No. CV-26-08028-PCT-KML<br>**ORDER** |

Plaintiff Justin Joy seeks review of Flagstaff Unified School District's alleged failure to provide his daughter, "Student," a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"). He argues the District withheld a FAPE by materially departing from Student's individualized education program ("IEP") when she underwent a psychiatric hospitalization and by denying Student's parents meaningful participation in various decisions about Student's education. The Administrative Law Judge ("ALJ") dismissed his claims. According due weight to the ALJ's findings, the decision is affirmed.

## I. Background

### A. The IDEA

Congress enacted the IDEA to meet "the educational needs of millions of children with disabilities." 20 U.S.C. § 1400(c)(2). The statute ensures "all children with disabilities have available to them a free appropriate public education . . . designed to meet their

unique needs." *Id.* § 1400(d)(1)(A). It also establishes procedural and substantive guarantees to such children and their parents. *Id.* § 1400(d)(1)(B).

The IEP is the main vehicle for delivering a FAPE to disabled children. Every eligible child must have an IEP drafted and implemented by their local educational authority—most commonly, the local public school district. *Id.* § 1414(d). The IEP addresses nearly all aspects of the child's education: behavioral and academic goals, progress towards those goals, special education services the child will receive day-to-day, and so on. *Id.* § 1414(d)(1)(A)(i). The team responsible for creating an IEP must include the child's parents and other various educators. *Id.* § 1414(d)(1)(B). Parents receive many procedural protections under the IDEA. For example, they are entitled to participate in meetings about the IEP, examine all educational records about their child, and receive notice anytime the district proposes or refuses changes to the IEP. *Id.* § 1415(b).

If parents take issue with the IEP or "the provision of a [FAPE]" to their child, they may file a complaint before the state educational agency. *Id.* § 1415(b)(6), (7). The agency may hold a due process hearing to determine "whether a child received a [FAPE]." *Id.* § 1415(f)(3)(E)(i). Once the agency rules, an aggrieved party may file a civil action in federal district court after exhausting any remaining administrative remedies. *Id.* § 1415(i)(2)(A).

**B. Student**

In September 2024, Student enrolled at Mount Elden Middle School, a school within the District. (Doc. 1-2 at 7.) Student was disabled under the IDEA, so Mount Elden was responsible for implementing and revising the IEP from her previous school. (Doc. 1-2 at 7.) Student's parents, the parents' advocates, and other providers working with the family were present at meetings about the formation of her IEP Addendum. (Docs. 1-2 at 8; 25 at 5.) The IEP provided for set amounts of interpersonal and social skills instruction and counseling each week, among other educational services. (Doc. 25 at 21–23.) Specifically, Student's IEP said she would receive: (1) interpersonal and social skills instruction for 270 minutes per week; (2) counseling for 30 minutes per week; and (3) safety monitoring by a

health aide for 360 to 420 minutes per day. (Docs. 36 at 20; 25 at 21–23.)

About a month into school, Student's IEP team considered revising her IEP and her Behavior Intervention Plan. (Doc. 25 at 43.) But a prior written notice ("PWN") from October 14, 2024 explained the school would "continue to follow [Student's] current IEP and [Behavior Intervention Plan]" because the family "requested additional time" to review relevant documents. (Doc. 25 at 43.)

It turned out that considering those proposed revisions would not occur for a while. After a string of behavioral incidents, the parents decided to hospitalize Student at Aurora Behavioral Health, a "Level One treatment facility" in the Phoenix area. (Doc. 1-2 at 9.) She was unable to attend school during that period, though Mount Elden employees understood the school would resume services upon her return. (Doc. 1-2 at 9.) The school did not require Student's hospitalization; it was the parents' choice. (Doc. 1-2 at 9.) Student moved to Aurora in early November 2024. (Doc. 1-2 at 9.)

The parents and certain school employees, misinformed by one of Student's providers back in Flagstaff, believed Aurora would take over Student's IEP and provide educational services during her stay. (Doc. 1-2 at 9; Doc. 30 at 324.) That was false. Parents realized the day before hospitalizing Student that Aurora actually did not provide any educational services and did not contract with any schools. (Doc. 1-2 at 9.) Student's stepmother later noted in an email to Mount Elden staff that "assessments" related to Student's IEP could not "be done as she [wa]sn't there" at Mount Elden. (Doc. 1-2 at 10 (quoting Doc. 26 at 6).) At least one Mount Elden employee who worked with Student also knew that Student would not—and could not—receive services because Aurora had previously told the employee that it would not permit instruction. (Doc. 1-2 at 15.) That employee later called Aurora and confirmed that Student could not receive educational services. (Doc. 1-2 at 15.)

Shortly after Student's hospitalization, the District issued a PWN. (Doc. 1-2 at 10.) It said Student's IEP reevaluation process would be suspended because Student was "withdrawn" from the school to enroll at a residential treatment center. (Doc. 1-2 at 10.)

Student's stepmother emailed back contesting the District's characterization: "I'm not sure if the PWN needs to be fixed. It says [Student] was withdrawn to enroll at [Aurora] . . . [Aurora] does not do any schooling and does not coordinate with any school. [Student] is still enrolled with [Mount Elden]. This is just a hospital stay." (Doc. 1-2 at 10 (quoting Doc. 26 at 6).) Nonetheless, Student did not receive any educational services from Aurora. Instead, her parents, District staff, special education program specialists and providers, and hospital staff would periodically meet at Aurora to discuss day-to-day progress. (Docs. 1-2 at 16; 30 at 56.) They did not discuss academics. (Doc. 1-2 at 16.)

Aurora discharged Student in early February 2025, and she promptly reenrolled at Mount Elden. (Doc. 1-2 at 11.) The school issued a PWN outlining a transition plan for Student's return to school. (Doc. 1-2 at 11.) That plan provided for an hour of virtual instruction and an hour of in-person instruction each day, Monday through Thursday. (Doc. 1-2 at 11.) The PWN also noted that in meetings about the transition plan (Doc. 30 at 151), parents disagreed that they ever "withdrew" Student from school when they sent her to Aurora (Doc. 1-2 at 11–12 (citing Doc. 25 at 55)). Parents also stated their preference that Student attend school in-person and full-time immediately. (Doc. 1-2 at 11–12 (citing Doc. 25 at 55).) The District ultimately proceeded with the transition plan, adding more sessions for Student later on and planning for her return to school full-time at the start of the 2025-26 school year. (Doc. 25 at 60, 100.)

On April 8, 2025, the school held an IEP meeting with parents and their advocates where they decided to keep Student's "goals and accommodations" similar to her prior IEP. (Doc. 25 at 63.) The team determined that it would base further adjustments to her IEP on data from an upcoming behavioral report. (Doc. 25 at 63.) In a later IEP, the team noted her behavior had improved since her return from Aurora; she experienced fewer outbursts and succeeded in "low-demand, time-limited situations." (Docs. 1-2 at 14–15; 25 at 69.)

**C. Procedural History**

In July 2025, Student's parents filed a due process complaint against the District with the Arizona Department of Education. (Doc. 1-2 at 3.) They alleged three claims under

the IDEA: (1) the District failed to comply with a number of the IDEA's procedural requirements; (2) the District materially failed to implement Student's IEP during and after her hospitalization at Aurora; and (3) the District prevented the parents from meaningfully participating in decisions regarding Student's education during her transition from Aurora back to Mount Elden and with respect to her Behavior Intervention Plan. (Doc. 1-2 at 3–5.)

An ALJ with the state Office of Administrative Hearings held a hearing and in January 2026 issued a written decision denying all relief. (Doc. 1-2.) Joy subsequently appealed the ALJ's decision to this court, but only as to the second and third allegations in his due-process complaint. (Doc. 1 at 11–15; 36 at 8; *see also* Doc. 37 at 5 (District's answering brief recognizing Joy sought "review of only two of the three claims pled in the due process complaint").)

## II. Legal Standard

In actions brought under 20 U.S.C. § 1415(i)(2), the court "(i) shall receive the records of the [state] administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). District courts must give "due weight" to the ALJ's decision if it is based on "thorough and careful" findings. *J.B. v. Kyrene Elementary Sch. Dist. No. 28*, 112 F.4th 1156, 1161 (9th Cir. 2024) (simplified). Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

That said, this standard of review is "less deferential" to the ALJ than in non-IDEA cases reviewing administrative decisions, *J.B.*, 112 F.4th at 1161, and courts "must actually examine the record to determine whether it supports the ALJ's opinion," *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 n.1 (9th Cir. 2017). Courts are "free to determine independently how much weight to give the" ALJ's determinations. *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1000 (9th Cir. 2009).

## III. Analysis

### A. Failure to Implement the IEP

Joy first argues the District withheld a FAPE by failing to implement the IEP during and after Student's hospitalization. (Doc. 36 at 13–21.) To prevail on a "failure to implement" claim, Joy must show that the deviation from the IEP was "material," meaning there was "more than a minor discrepancy" between the services promised and those provided. *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007). A "child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided." *Id.*

#### 1. Hospitalization Period

Both parties agree the District failed to implement Student's IEP while she was hospitalized at Aurora. (Docs. 36 at 8; 37 at 8.) But the District disputes whether it had a duty to provide a FAPE at all during that period. It did not.

Typically, a FAPE must be "available to all children with disabilities residing in the State." 20 U.S.C. § 1412(a)(1)(A). The local educational agency—here, the District—is the entity tasked with delivering a FAPE to children with disabilities "within its jurisdiction." *Id.* § 1413(a)(1). A local educational agency has jurisdiction over all children "residing" in its geographical boundaries according to state law. *See J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1191–92 (W.D. Wash. 2002) (collecting cases applying state law to determine residency under the IDEA); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1525 (9th Cir. 1994). Under Arizona law, because Student's parents remained residents within the District's boundaries when she was at Aurora, she too was a District resident under the IDEA. *Hughes v. Industrial Comm'n*, 211 P.2d 463, 466 (Ariz. 1949) (holding that a child's "residence is that of his parents"). By default, the District therefore owed her a FAPE, regardless of her hospitalization. 34 C.F.R. § 300.39(a)(1)(i) (contemplating instruction in hospitals); 20 U.S.C. § 1401(29)(A) (same).

The District raises, and the ALJ relied on, two defenses to argue it had no duty to implement the IEP: (1) Student's unenrollment from the District and (2) that it was not

permitted to provide educational services at Aurora. Student's unenrollment is irrelevant, but impossibility is a valid excuse for failing to implement her IEP.

First, the District claims the parents' "unilateral" decision to unenroll Student and place her in a private facility suspended its obligations to implement the IEP. (Doc. 37 at 9.) Even assuming Student's parents unilaterally disenrolled her, that is not by itself "a valid reason under the IDEA" to discontinue IEP meetings and withhold a FAPE. *J.B.*, 112 F.4th at 1164–65. Scenarios where districts may cease offering a FAPE sometimes involve unenrollment, but they tend to also involve other circumstances not present here. For example, local educational agencies may pass off their duties to provide a FAPE if a student transfers districts, 20 U.S.C. § 1414(d)(2)(C)(i), or enrolls in private school after the agency has offered an adequate FAPE, *id.* § 1412(a)(10). FAPE obligations may also end when a parent sends their child to an out-of-district private school and "makes clear his or her intent" the student will remain unenrolled in the district. *J.B.*, 112 F.4th at 1164 (quoting 71 Fed. Reg. 46,540, 46,593 (2006)). Here, however, the District knew Student's stay at Aurora was temporary—teachers were ready to "pick back up with services" upon her return. (Doc. 1-2 at 9.)

The lack of educational instruction permitted at Aurora (Doc. 1-2 at 9) also distinguishes Student's circumstances from those in *Jasa v. Millard Public Sch. Dist.*, 206 F.3d 813 (8th Cir. 2000)—the only authority the District cites to support its unenrollment argument. There, the parents unilaterally unenrolled their child from a school district and, for non-educational reasons, placed him at a nursing facility (which administered its own educational services). *Jasa*, 206 F.3d at 814–15. The school had provided and remained willing to provide a FAPE, so the question was whether the school had to reimburse the family for the cost of education at the nursing facility under 20 U.S.C. § 1412(a)(10)(C)(i). *Id.* at 815. The Eighth Circuit held no reimbursement was necessary because the relevant statute and regulations clearly stated the school district did not need "to pay for the cost of education" where the parents chose to place the child in a "private school or facility" and where the district had already provided a FAPE. *Jasa*, 206 F.3d at 815 (citing 20 U.S.C.

§ 1412(a)(10)(C)(i); 34 C.F.R. § 300.148(a)). Those reimbursement provisions do not apply here, *see Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1139 (9th Cir. 2021); the provision of actual educational services falls within § 1412(a)(1)(A) instead, and there was no "cost of education" to reimburse in any event because Aurora did not offer any educational services. *Jasa* does not help the District.

To be clear, this does not mean the District should have been required to provide services at Aurora had that been possible. It means simply that the IDEA does not allow the District to shed its obligations to implement Student's IEP because of a temporary disenrollment. *J.B.*, 112 F.4th at 1164–65.

But ultimately, the ALJ properly ruled that even assuming the District "improperly disenrolled Student . . . due to her hospitalization," it was not possible to provide educational services while she was hospitalized—so the District did not fail to provide a FAPE during that time. (Doc. 1-2 at 23.) The parties have not cited, and the court has not found, any statutes, regulations, or Ninth Circuit authority speaking directly to the viability of this sort of "impossibility" defense under the IDEA. Yet the IDEA should not be read to impose costs on schools for failing to provide services they could not provide. Two other circuits have embraced this logic. *See Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 250–51 (3d Cir. 2009); *Butler v. Evans*, 225 F.3d 887, 891–92 (7th Cir. 2000). In both cases, the child experienced a psychological crisis leading to hospitalization that made instruction and evaluation impossible. *Mary T.*, 575 F.3d at 250; *Butler*, 225 F.3d at 892–93. The respective schools were therefore unable to timely develop and implement IEPs for those children. *Mary T.*, 575 F.3d at 250; *Butler*, 225 F.3d at 892–93. Both decisions recognized that the districts in question did *not* violate the IDEA by delaying IEP implementation or reevaluation until it was possible to administer services, even if that delay detracted from the terms of the IEP. *Mary T.*, 575 F.3d at 250; *Butler*, 225 F.3d at 892–93. Although neither panel outright labelled their reasoning as an "impossibility" defense, their reasoning endorsed something akin to one.

Joy, for his part, cites two cases rejecting an impossibility defense in this context. (Doc. 1 at 6 (citing *Brown v. District of Columbia*, No. 1:17-cv-00348 (RDM/GMH), 2019 WL 3423208 (D.D.C. July 8, 2019); *Schiff v. District of Columbia*, No. 18-CV-1382 (KBJ), 2019 WL 5683903 (D.D.C. Nov. 1, 2019) (adopting report and recommendation)[1]).) Those cases correctly pointed out that no statutory or regulatory provisions authorize an impossibility defense (while also concluding none applied on the facts of either case). *Schiff*, 2019 WL 5683903, at *1, *7; *Brown*, 2019 WL 3423208, at *16–18. But in rejecting that the defense could ever apply, both courts shot down a theory of impossibility grounded in *contract*. *Schiff*, 2019 WL 5683903, at *7; *Brown*, 2019 WL 3423208, at *16. Instead, federal grant programs "remain governed by statutory provisions," and courts must rely on "the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Schiff*, 2019 WL 5683903, at *7 (simplified); *Brown*, 2019 WL 3423208, at *16.

Beyond observing that the IDEA does not expressly authorize an impossibility defense, neither *Schiff* nor *Brown* analyzed the viability of such a defense using principles of statutory interpretation. And here, the purpose and function of the IDEA provides support. "Whenever possible, statutes should be interpreted to avoid unreasonable results." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982). Though reasonability is often in the eye of the beholder, it is unlikely the IDEA was meant to hold schools liable for failing to implement an IEP—through no fault of their own—when one could not possibly have been implemented. *Mary T.*, 575 F.3d at 250. "It is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible." *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000); *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 994 (D.C. Cir. 2024) ("[W]e should not lightly assume that a statute . . . demands the impossible." (quoting *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 350–52 (1937))).[2]

---

[1] Joy actually cites "*McDowell v. District of Columbia*, No. 18-1382 (KBJ/DAR), 2019 WL 5198017 (D.D.C. Sept. 12, 2019)." (Doc. 1 at 6.) The court could not locate any case matching that citation, but the case number and factual description match *Schiff v. District of Columbia*, 2019 WL 5683903, so the court assumes this was Joy's intended authority.

[2] Joy fears that authorizing something like an impossibility defense would allow schools to "suspend their statutory obligations whenever a student's hospitalization makes

To hold schools liable in these situations would also conflict with how courts conceive of equitable remedies under the IDEA. Remedies like reimbursement and compensatory education track what a school "should have paid all along and would have borne in the first instance had it developed a proper IEP." *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370–71 (1985). Compensation therefore follows a rough "but for" analysis, attempting to "plac[e] disabled children in the same position they would have occupied but for the school district's" actions. *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011) (simplified). If a district would not have borne any costs had it adhered to the IEP or the IDEA, then it should not owe compensation. So although Joy insists he does "not contend that Defendant was required to provide services that Aurora prohibited or that Student's mental condition made impossible" (Doc. 38 at 4), by demanding reimbursement and compensatory education, that is exactly what he seeks.[3]

Turning back to this case, the District could not have implemented Student's IEP during her hospitalization. The District's executive director for special education testified that she both knew and confirmed that the District could not provide any instruction at Aurora. (Doc. 30 at 458–59.) Those factual findings were incorporated by the ALJ (Doc. 1-2 at 9, 15), and Joy never raised any evidence disputing them. Joy instead contends the District never confirmed the impossibility of providing services at Aurora when Student was first hospitalized. (Doc. 38 at 4.) But the question of *when* the District learned instruction would be impossible is not relevant. And to the extent Joy is arguing the District might have been mistaken, he has not met his evidentiary burden to provide facts supporting his theory. 20 U.S.C. § 1415(i)(2)(C). According "due weight" to the ALJ's

---

compliance difficult or inconvenient." (Doc. 36 at 16–17.) Impossibility is not just difficulty or inconvenience. If providing services is difficult, but possible, parents and students may offer evidence of that possibility to show a district's continuing obligations.

[3] Relatedly, even if the IDEA does not authorize an impossibility defense, the "broad discretion" the court has when fashioning relief requires considering "all relevant factors." *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 16 (1993). Here, considering that Student's parents and at least one District employee knew Aurora would not provide educational services by the time Student enrolled (Doc. 1-2 at 9, 15), equity favors denying any sort of reimbursement or compensatory education.

findings of fact, *Rowley*, 458 U.S. at 206, Joy is not entitled to relief for the period Student was hospitalized.

**2. Post-Hospitalization**[4]

Joy next argues that the District failed to implement Student's IEP when she returned to school, imposing a schedule that materially departed from the IEP's terms. (Doc. 36 at 17.) He failed to prove this claim by a preponderance of the evidence. When Student was supposed to return to school on February 18, 2025, the operative IEP required Student to have: (1) interpersonal and social skills instruction for 270 minutes per week; (2) counseling for 30 minutes per week; and (3) safety monitoring by a health aide for 360 to 420 minutes per day. (Docs. 36 at 20; 25 at 21–23.) Student received two hours of instruction per day, Monday through Thursday, amounting to 480 minutes per week. (Docs. 1-2 at 11; 25 at 57.) Plaintiffs never presented any evidence that those 480 minutes per week failed to cover the interpersonal and social skills instruction and counseling requirements, which take up only 300 minutes per week combined. In fact, Carrie Lamberti, a special education therapist for Student, testified that Student *did* receive her 30 minutes of counseling every day during that period. (Doc. 30 at 196.) The District also later tacked on an additional ten minutes of online instruction and another 30-minute online session on Fridays. (Doc. 1-2 at 12.)

As for the additional 360 to 420 minutes for safety monitoring, the deficit in minutes was not a material departure from the IEP because Student was only physically at school—and therefore presumably only required safety monitoring—for an hour each day. (Doc. 1-2 at 11–12.) And as the ALJ pointed out, Student's subsequent improvement at school reinforces the immateriality of any deviation from her IEP. (Doc. 1-2 at 24 (citing *Van Nuys*, 502 F.3d 811).) Joy contends the ALJ erred by relying on Student's later progress, citing the "snapshot" rule. (Doc. 36 at 21.) But that rule is relevant only when evaluating

[4] The District argues the court should "strike[] as irrelevant" Joy's claim that the District failed to provide a FAPE following the hospitalization. (Doc. 37 at 13.) But Joy presented this post-hospitalization period as a distinct argument in his brief (Doc. 36 at 20–21), complaint (Doc. 1 at 11, 14–15), and due process complaint before the ALJ (Doc. 22 at 14–15), which the ALJ decided adversely (Doc. 1-2 at 24). The court will address it.

the substantive adequacy of an IEP, *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010), not in determining whether a school materially departed from implementing an IEP, *Van Duyn*, 502 F.3d at 822. In this context, evidence of educational progress may be considered and undermines Joy's claim. *Id.*

**B. Meaningful Participation**

Lastly, Joy argues Student's parents were denied meaningful participation in the IEP process. The right of parental participation is one of the IDEA's "most important" procedural guarantees. *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001). Schools must affirmatively engage with parents in crafting their child's education, such as by providing parents "written prior notice" of changes to the IEP, 20 U.S.C. § 1415(b)(1)(C); ensuring that at least one of the parents is "present at each IEP meeting or [is] afforded an opportunity to participate," 34 C.F.R. § 300.322(a); or seriously considering the "concerns of the parents" in developing and revising the IEP, 34 C.F.R. § 300.324(a)(1)(ii), (a)(6), (b). School officials may not enter IEP meetings with a "take it or leave it" position. *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131 (9th Cir. 2003). But that does not give parents an effective "veto" over every proposed part of an IEP. *Id.*

Joy argues he and Student's stepmother were denied meaningful participation in four decisions: (1) Student's disenrollment from Mount Elden; (2) the post-hospitalization transition plan; (3) the April 2025 proposed IEP; and (4) the District's "Behavior Intervention Plan" revision. But the record contains sufficient evidence to support the ALJ's conclusion that the District afforded meaningful participation to the parents during all relevant periods.

The parents' lack of participation in Student's disenrollment was lawful because in this context, their participation would not have affected Student's ability to receive a FAPE. The basis for requiring meaningful participation in the first place is specifically to ensure each child's IEP provides a FAPE. *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir. 1992), *superseded by statute on other grounds*, Individuals

with Disability Education Act Amendments of 1997, Pub. L. 105–17, § 614(d)(1)(B), 111 Stat. 37. Student's withdrawal from the District occurred after she was hospitalized, and whether she was formally enrolled or not could not change *Aurora's* policies precluding educational services. (Doc. 1-2 at 10.) That harmless error absolves the District.[5]

Ninth Circuit authorities also tie the right of meaningful participation to "participat[ion] in the IEP formulation process." *L.M.*, 556 F.3d at 910 (simplified); *W.G.*, 960 F.2d 1483; *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001). The disenrollment decision could not have affected the formulation of Student's IEP. Substantively updating Student's IEP would not have been possible because Student was not present for the required assessments, as Student's stepmother recognized in an email shortly after the disenrollment. (Doc. 1-2 at 10 (quoting Doc. 26 at 6).) So regardless of the parents' participation, the IEP would not have changed.

Regarding the post-hospitalization transition plan, Joy complains the District unilaterally removed Student from in-person instruction and "condition[ed]" future in-person attendance on acceptance of the District's proposed program. (Doc. 36 at 23.) To start, it is not true that the District "refuse[d] to allow [Student] to attend physically." (Doc. 36 at 23.) She attended an hour in-person four times a week. (Doc. 1-2 at 11.) That aside, Joy fails to offer enough evidence that the District unlawfully discarded the parents' concerns. All he cites is the ALJ's summary of his position—which itself does not cite anything—and his own testimony that he felt he was in a "take it or leave it" situation. (Doc. 36 at 23 (citing Docs. 1-2 at 5; 30 at 151).) By contrast, the ALJ noted that multiple PWNs issued in February 2025 recognized the positions of the parents and their advocates. (Doc. 1-2 at 11 (citing Doc. 25 at 53, 55).) Joy also attended a meeting to discuss the transition and "negotiate[d]." (Doc. 30 at 151.) As a result of those negotiations, the District

[5] The Ninth Circuit has adopted a harmless error test for procedural violations of the IDEA that looks to whether the violation caused "a loss of educational opportunity" or "significantly restricted parental participation." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009). That does not mean every restriction of parental participation in any context is necessarily harmful: authorities still hitch the harm of a lack of participation to whether the child was denied a FAPE. *W.G.*, 960 F.2d at 1483. Under that logic, if the District denied participation without impacting the child's IEP or FAPE, that error qualifies as harmless. *Id.*

expressly incorporated the parents' desired minimum of two hours of instruction per day. (Doc. 25 at 57.) Joy's subjective "feeling" that he faced a "take it or leave it" choice does not prove by a preponderance that the District withheld meaningful participation when record evidence contradicts it.

Joy does not offer any additional evidence that he was denied participation in forming proposed IEP in April. Again, the record shows *some* participation; Joy attended the April 8, 2025 IEP meeting (Doc. 30 at 129–30), and a PWN issued after (Doc. 25 at 63). Without more, Joy does not meet his burden in proving such participation was insufficient under the IDEA.

Finally, Joy contests his lack of meaningful participation in the District's unilateral revision of Student's Behavior Intervention Plan in October 2024. (Doc. 36 at 21.) Here, too, Joy cites nothing but the ALJ's summarization of his own position. (Doc. 36 at 24.) If anything, the record shows the District chose not to revise the Plan until it had both parents' input. In a PWN from October 14, 2024, school officials stated they would "continue to follow [Student's] current [Plan]" until her parents were able to review documents relevant to possible revisions, after which they could all "meet on the proposed documents." (Doc. 25 at 43.) Joy fails to explain how the District denied him participation when it waited to take action until he and Student's stepmother were both up to speed.

## IV. Attorney's Fees

The IDEA states that a "court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parent or guardian of a child or youth with a disability who is a prevailing party." 20 U.S.C. § 1415(i)(3)(B)(i)(I). Because Joy is not a prevailing party, he is not entitled to fees.

## V. Conclusion

Based on a preponderance of the evidence, the ALJ properly held the District satisfied the IDEA because it did not materially fail to implement Student's IEP and it provided meaningful participation to her parents.

Accordingly,

**IT IS ORDERED** affirming the decision of the ALJ.

**IT IS FURTHER ORDERED** directing the Clerk to enter final judgment consistent with this Order and close this case.

Dated this 10th day of November, 2026.



**Honorable Krissa M. Lanham**
**United States District Judge**